IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DOS SANTOS, S.A., and
CROSS BRIDGE, LLC                                      PLAINTIFFS

          v.              Civil No. 05-5097

MIKE BEEBE, in his official
capacity as Attorney General,
State of Arkansas                                       DEFENDANT


O R D E R

Now on this 6th day of March, 2006, comes on for consideration **Defendant's Motion To Dismiss** (document #3), and from said motion, and the response thereto, the Court finds and orders as follows:

1.    Plaintiffs seek to enjoin, both preliminarily and permanently, enforcement of **A.C.A. §26-57-260-261,** as amended by **Act 384 of 2005,** claiming that this statute violates a number of constitutional and statutory provisions.   Defendant moves to dismiss all of plaintiffs' claims pursuant to **F.R.C.P. 12(b)(6),** taking the position that plaintiffs have failed to state claims upon which relief can be granted.

2.    The applicable standard on a motion to dismiss for failure to state a claim is well settled:

> A complaint should not be dismissed for failure to state a claim unless it appears beyond  doubt  that  the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  A complaint must  be  viewed  in  the  light  most  favorable  to  the plaintiff and should not be dismissed merely because the court doubts that a plaintiff will be able to prove all of  the  necessary  factual  allegations.    Thus,  as  a practical  matter,  a  dismissal  under  Rule  12(b)(6)  is

> likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.

**Krentz v. Robertson Fire Protection District**, **228 F.3d 897 (8th Cir. 2000)** (internal citations and quotation marks omitted).

3.   The factual allegations of the Complaint may be summarized as follows[1]:

*   Plaintiff Dos Santos, S.A. ("Dos Santos") is a tobacco products manufacturer which has sold its tobacco products in the State of Arkansas since 2004.

*   Plaintiff Cross Bridge, LLC ("Cross Bridge") is the exclusive importer and distributor of Dos Santos' products in the State of Arkansas.

*   Defendant is the Arkansas Attorney General, and is charged with enforcing the challenged statute.

*   In 1998, Arkansas, along with 45 other states and six territories (the "Settling States"), settled litigation against certain tobacco companies, seeking reimbursement for medical costs associated with tobacco use. The settlement was memorialized in a document entitled the Master Settlement Agreement ("MSA"), and the settling tobacco companies are generally referred to as "Original Participating Manufacturers" or "OPMs."

---

[1] In preparing this summary, the Court has set forth the actual text of statutes, rather than the summaries thereof contained in the Complaint, and has omitted plaintiffs' legal conclusions drawn from the facts, inasmuch as it is the function of the Court on a motion to dismiss to determine if the facts - assuming them true - would warrant the conclusions posited.

\*      The MSA provides for annual payments by each OPM for the benefit of the Settling States.  The amount of each such payment is based principally on the relative national market share of the OPM making the payment.  The payments are divided among the Settling States based on a fixed formula that apportions the payment into what is referred to as each Settling State's "Allocable Share."

\*      The MSA imposes restrictions on the OPMs in the areas of advertising, political lobbying, trade association activities, and legal challenges to state laws regulating tobacco, which the Settling States could not have constitutionally imposed on the OPMs absent their agreement.

\*      After the MSA was signed, tobacco manufacturers who were not defendants in the litigation were offered an opportunity to sign the MSA.  Those who elected to sign are referred to as "Subsequent Participating Manufacturers" or "SPMs," and the entire group of signatories is referred to as "Participating Manufacturers" or PMs.  Those manufacturers who elected not to sign the MSA are referred to as Nonparticipating Manufacturers or "NPMs."  Dos Santos is an NPM.

\*      The MSA contained incentives to the Settling States to enact statutes which would require NPMs to place money in escrow each year based on their market shares.  The MSA justified the escrow statutes on two theories: they would create a reserve fund to guarantee a source of recovery from NPMs if they are later

proven to have acted culpably, and they would neutralize the cost disadvantages of PMs *vis a vis* NPMs.

    \*    Arkansas enacted the Escrow Statute, codified at **A.C.A. §26-57-260 and 261.**  As originally enacted, **A.C.A. §26-57-261** provided, in relevant part, as follows:

> Any tobacco product manufacturer selling cigarettes to consumers within the state . . . after the date of enactment of this section, shall do one (1) of the following:
>
> (1) Become a participating manufacturer, as that term is defined in section II(jj) of the Master Settlement Agreement, and generally perform its financial obligations under the Master Settlement Agreement; or
>
> (2)(A) Place into a qualified escrow fund by April 15 of the year following the year in question the following amounts. . . .[2]
>
> (B)  A tobacco product manufacturer that places funds into escrow pursuant to subdivision (a)(2)(A) of this section shall receive the interest or other appreciation on such funds as earned.  Such funds themselves shall be released from escrow only under the following circumstances:
>
> (i)  To pay a judgment or settlement on any released claim brought against such tobacco product manufacturer. . . .
>
> (ii)  To the extent that a tobacco manufacturer establishes that the amount it was required to place into escrow in a particular year was greater than the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement, as determined pursuant to section IX(i)(2) of the Master Settlement Agreement and before any of the adjustments or offsets described in section IX(i)(3) of that agreement other

---

[2]There follows a schedule of amounts "per unit sold" which increased over the years from 1999 through 2007.

than the inflation adjustment, had it been a
participating manufacturer, the excess shall be released
from escrow and revert back to such tobacco product
manufacturer.

ii) To the extent not released from escrow under
subdivisions (a)(2)(A)(i) or (a)(2)(A)(ii) of this
section, funds shall be released from escrow and revert
back to such tobacco product manufacturer twenty-five
(25) years after the date on which they were placed into
escrow.

* **A.C.A. §26-57-261(2)(B)(ii)** was known as the "Allocable

Share Refund" provision. It insured that an NPM would not pay

more, under the Escrow Statute, than the amount Arkansas would have

received from that NPM if it had been a PM.

* In February, 2005, the Arkansas General Assembly amended

the Allocable Share Refund provision by **Act 384 of 2005.** The

amended provision (the "Allocable Share Amendment") is codified at

**§26-57-261(a)(2)(B)(ii),** and provides as follows:

To the extent that a tobacco product manufacturer
establishes that the amount it was required to place into
escrow on account of units sold in the state in a
particular year was greater than the Master Settlement
Agreement payments, as determined under section IX(i) of
the Master Settlement Agreement including after final
determination of all adjustments, that the manufacturer
would have been required to make on account of the units
sold had it been a participating manufacturer, the excess
shall be released from escrow and revert back to such
tobacco product manufacturer. . . .

* The State of Arkansas stipulated, in state court

proceedings involving the MSA, that the Escrow Statute as

originally enacted, would "effectively and fully neutralize" the

cost disadvantages that PMs would experience *vis a vis* NPMs.

-5-

* The Allocable Share Amendment retroactively eliminated refund of escrowed overpayments for 2004, and placed plaintiffs and other NPMs at a competitive disadvantage.

* Under the Allocable Share Amendment, an NPM's escrow payments for sales in Arkansas will be greater than the amount Arkansas would have received if that NPM were a PM.

* Arkansas has not filed a complaint against either plaintiff, nor entered into a settlement of any claim against them.

* There is no basis to believe that Dos Santos or the other NPMs are likely to be found liable for greater damages than the PMs during the next 25 years.

* The purpose of the Amendment is to coerce NPMs to join the MSA, thereby making non-refundable MSA payments and waiving certain First Amendment rights.

* An additional purpose of the Amendment is to cause the NPMs to raise their cigarette prices so as to prevent them from competing in the Arkansas market against MPs.

* In 2004, Dos Santos was listed as a certified tobacco product manufacturer in Arkansas.

* Dos Santos made timely quarterly deposits for all its 2004 cigarette sales in Arkansas, and as of the date of the Complaint, had over $500,000.00 in a Qualified Escrow Account in Arkansas. Had Dos Santos been a PM, under the MSA formula the share of those funds allocable to Arkansas would be less than

$10,000.00.

\* Dos Santos had expected to use the refund of its 2004 escrow payments to make its first quarterly escrow payment in 2005, but defendant has refused to refund any of the escrowed amount. Without the refund, Dos Santos was unable to make its first 2005 escrow payment, and has been placed at risk of being removed from the list of approved tobacco products manufacturers in Arkansas.

\* The retroactive effect of the Allocable Share Amendment irreparably harms Dos Santos, because its escrow costs for 2004 and the first quarter of 2005 exceed the revenue generated by its sales during that period.

\* The Allocable Share Amendment discriminates against NPMs by substantially raising their costs of doing business, as compared to PMs, without a rational basis to do so.

\* The effect of the Allocable Share Amendment is that of an output cartel and price fixing scheme among the PMs.

\* The Amendment will force Dos Santos to raise its prices, with a corresponding drop in sales.

\* Count I seeks a judicial declaration that the Allocable Share Amendment is unconstitutional. While the Complaint at this point is not a model of clarity, it appears that the bases for relief urged in Count I are the due process clauses of the 5th and 14th Amendments to the United States Constitution and the impairment of contracts provisions found in Article 2, §17, of the

Arkansas Constitution.

* Count II alleges antitrust violations under the Sherman Act and Article 2, §19, of the Arkansas Constitution. The gist of those allegations is that the Allocable Share Amendment is designed to force NPMs to raise their prices, so as to prevent competition with PMs.

* Count III alleges that the Allocable Share Amendment violates the free speech, association and petition provisions of the First Amendment to the United States Constitution and Article 2, §4 and §6, of the Arkansas Constitution. The gist of the allegation is that the purpose of the Allocable Share Amendment is to coerce NPMs into signing the MSA, which would require them to give up certain free speech, association, and petition rights.

* Count IV alleges violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and similar provisions found in Article 2, §3[3] and §18, of the Arkansas Constitution, based on the classification system used in the Allocable Share Amendment.

* Count V alleges violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the provisions of Article 2, §21, of the Arkansas Constitution, said to arise from "an unwarranted prejudgment seizure" of Dos Santos' escrow deposits.

_____

[3]Although the Complaint references §4, the context leads the Court to conclude that §4 was intended.

\*      Count VI alleges violations of the Commerce and Supremacy Clauses of the United States Constitution, the gist of which is that the Allocable Share Amendment unjustifiably burdens interstate commerce and imposes a national cost on a state-wide business.

4.      Defendant first argues that plaintiffs' claims should be dismissed because the Allocable Share Amendment is not retroactive. This curious argument appears to rest on defendant's assertion that Act 384 of 2005 clearly applies to funds that had already, before it was passed, been deposited into escrow.  Plaintiffs do not deny that the law applies to funds that had already been deposited in escrow, and, indeed, this is the crux of their retroactivity argument.   The Supreme Court has recognized that a law is retroactive if it "attaches new legal consequences to events completed before its enactment."  **Landgraf v. USI Film Products, 511 U.S. 244, 270 (1994).**  Act 384 of 2005 affected the refund of Dos Santos' 2004 escrow deposits, which had already been deposited when the Act was passed.   Thus the Allocable Share Amendment clearly is - and was intended to be - retroactive legislation.

5.      Defendant next argues that plaintiffs' antitrust claims are subject to dismissal.  Defendant contends that the Allocable Share Amendment is a unilateral act of the State of Arkansas, and as such, is immune from antitrust scrutiny under the doctrine of state action immunity.

Plaintiffs argue that the Allocable Share Amendment creates a

form of "hybrid restraint" of competition, an exception to the state action doctrine. They summarize their antitrust claim thus: the effect of the MSA, as implemented by the Amended Allocable Share Refund provision, is to increase NPM costs, reduce pricing pressure on OPMs, and encourage PMs to reduce their output.

The Allocable Share Amendment is an act of the Arkansas Legislature, and as such, the Sherman Act issue is analyzed according to special rules that have developed over the years with regard to the antitrust effect of state statutes, and which make the acts of state sovereigns virtually immune to attack under federal antitrust provisions.

The state action immunity doctrine arose out of the case of **Parker v. Brown**, **317 U.S. 341 (1943),** wherein it was decided that the Sherman Act was directed to individual rather than state action, and was not violated by state regulatory programs. It was further developed in **Rice v. Norman Williams Co.**, **458 U.S. 654 (1982),** where the Court stated that

> [i]n determining whether the Sherman Act pre-empts a state statute, we apply principles similar to those which we employ in considering whether any state statute is pre-empted by a federal statute pursuant to the Supremacy Clause. As in the typical pre-emption case, the inquiry is whether there exists an irreconcilable conflict between the federal and state regulatory schemes. The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute. A state regulatory scheme is not pre-empted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might cause him to violate the antitrust laws. A state statute is not pre-empted by the federal

antitrust laws simply because the state scheme might have an anticompetitive effect.

*    *    *

Our decisions in this area instruct us . . . that a state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute. Such condemnation will follow under §1 of the Sherman Act when the conduct contemplated by the statute is in all cases a *per se* violation. If the activity addressed by the statute does not fall into that category, and therefore must be analyzed under the rule of reason, the statute cannot be condemned in the abstract. Analysis under the rule of reason requires an examination of the circumstances underlying a particular economic practice, and therefore does not lend itself to a conclusion that a statute is facially inconsistent with federal antitrust laws.

**458 U.S. at 659-61.**

In **324 Liquor Corp. v Duffy**, **479 U.S. 335 (1987)**, the Court noted that it had, over time, established a two-part test for determining state action immunity under **Parker**:  the challenged restraint must be "clearly articulated and affirmatively expressed as state policy," and must be "actively supervised by the state itself."  **479 U.S. at 343**.  Yet even those requirements do not apply when the restraint under consideration is a state statute rather than the act of a subdivision of state government:

In the years since the decision in *Parker*, the Court has had occasion in several cases to determine the scope of the state-action doctrine.  It has never departed, however, from *Parker's* basic reasoning. . . . If the replacing of entirely free competition with some

form of regulation or restraint was not authorized or
approved by the State then the rationale of *Parker* is
inapposite.  As a result, in cases involving the
anticompetitive conduct of a nonsovereign state
representative the Court has required a showing that the
conduct is pursuant to a "clearly articulated and
affirmatively expressed state policy" to replace
competition with regulation.  The Court also has found
the degree to which the state legislature or supreme
court supervises its representative to be relevant to the
inquiry.  When the conduct is that of the sovereign
itself, on the other hand, the danger of unauthorized
restraint of trade does not arise.  Where the conduct at
issue is in fact that of the state legislature or supreme
court, we need not address the issues of "clear
articulation" and "active supervision."

**Hoover v. Ronwin, 466 U.S. 558, 568-69 (1984)** (internal citations

omitted).

There is a limited exception to the state action immunity

doctrine, explained in **Fisher v. City of Berkeley, California, 475**

**U.S. 260 (1986)** as follows:

Not all restraints imposed upon private actors by
government units necessarily constitute unilateral action
outside the purview of §1 [of the Sherman Act].  Certain
restraints may be characterized as "hybrid," in that
nonmarket mechanisms merely enforce private marketing
decisions.  Where private actors are thus granted "a
degree of private regulatory power," the regulatory
scheme may be attacked under §1.

**475 U.S. at 267-68.**

Plaintiffs suggest that the Allocable Share Amendment comes

within the purview of the hybrid restraint exception to the state

action immunity doctrine.  They reason that the MSA and its

ancillary legislation contain such incentives for tobacco companies

to increase their prices and keep their output levels the same,

that it has the same effect on the market as if those companies had formed an "output cartel."

The Court does not agree with the proposition that if the potential *effect* of a statute on the market is as though private parties had created an output cartel, the statute necessarily runs afoul of the Sherman Act. It is only in very limited circumstances that such occurs. **California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.**, **445 U.S. 97 (1980)**, illustrates the extremely narrow circumstances in which a state statute will be pre-empted by the Sherman Act. In **Midcal**, a California statute *required* liquor dealers to set prices and imposed fines on those who sold for less. The state had no direct control over the prices, and did not review the prices that were set. The Court held that the statute was pre-empted because it literally mandated price-fixing by private parties. In an oft-quoted passage, the Court stated that the "national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." **445 U.S. at 97.**

In **Midcal**, what the state did was essentially to bless private antitrust conduct and enforce violations. In the case at bar, there is no allegation that the Allocable Share Amendment mandates or authorizes price-setting or output fixing by private parties. Instead, plaintiffs allege that the effect of the Allocable Share

Amendment (in conjunction with the other statutes enacted pursuant to the MSA) is to cause or allow the PMs to conduct their business as though they were part of an output cartel. The Amendment, however, does not on its face authorize, much less require, such behavior. It simply establishes one aspect of the cost of doing business in Arkansas for those tobacco companies who have chosen not to participate in the regulatory scheme established by the MSA. Individual tobacco companies remain free to raise or lower their prices or their output as they see fit, and there is, at worst, a hypothetical or potential conflict with federal antitrust law, not the irreconcilable conflict that would be required to invalidate the Amendment under federal anti-trust law.

For the foregoing reasons, the Court concludes that plaintiffs can prove no set of facts under which the Allocable Share Amendment would be pre-empted by the Sherman Act, and the Motion To Dismiss will be granted as to that claim.

6. Defendant also contends that plaintiffs have failed to state a claim under Article 2, §19 of the Arkansas Constitution, which prohibits monopolies. Defendant relies on **Gipson v. Morley**, **217 Ark. 560, 233 S.W.2d 79 (Ark. 1950)**, wherein it was said that

> the courts of Arkansas, like those of all American
> states, have sustained these monopolistic grants of
> special privilege on the ground that it is within the
> competency of the legislature to determine under the
> police power what regulatory rules are needful in
> controlling a type of business fraught with perils to
> public peace, health and safety as is the liquor
> business.

**217 Ark. at 567.**

The Emergency Clause of the Amendment makes it clear that the State of Arkansas also finds the tobacco business to be "fraught with perils to public . . . health and safety:

> [i]t is found and determined by the General Assembly of the State of Arkansas that smoking poses a serious health risk to Arkansans; that the Master Settlement Agreement is a critical component in reducing the rate of smoking in Arkansas; and that the provisions of this act are immediately necessary for the continued effective administration and enforcement of provisions of the Master Settlement Agreement in Arkansas.

**Acts 2005, No. 384, §5.** This is a clear expression by the Arkansas Legislature that the regulatory scheme of which the Amendment forms a part is created to serve the public interest. Thus, to the extent that it might foster monopolistic conduct, it would not violate Article 2, §19, of the Arkansas Constitution, and plaintiffs' claim that it would do so must be dismissed.

7. Defendant next argues that plaintiffs' freedom of speech claims must be dismissed.

The gravamen of plaintiffs' First Amendment claim is that the Act imposes penalties on Dos Santos, as an NPM, for refusing to waive its First Amendment rights. Fleshed out, this argument appears to be (a) that because the Allocable Share Amendment requires Dos Santos to pay more into its Arkansas escrow account than the amount Arkansas would receive as its allocable share of Dos Santos' MSA payment if Dos Santos were a PM, its freedom of speech (maintained by not signing the MSA) is impermissibly

burdened; and (b) that Dos Santos is being coerced, or at least "needlessly encouraged," to waive certain free speech rights by economic pressure to sign the MSA.

These arguments are based on the allegation that under the Allocable Share Amendment, Dos Santos' escrow payments for sales in Arkansas will be greater than the amount Arkansas would have received if Dos Santos were a PM. While this allegation must be accepted as true on a motion to dismiss, it misses the point. It is not an allegation that the regulatory scheme is so structured that it costs a tobacco manufacturer more to be an NPM than a PM. The Allocable Share Amendment does not require Dos Santos, or any other NPM, to pay more *per cigarette* into escrow than it would pay *per cigarette* under the MSA if it were a PM. The relevant text of the Amendment is this:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of **units sold in the state** in a particular year **was greater than the Master Settlement Agreement payments** . . . that the manufacturer would have been required to make on account of the **units sold**[4] had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer. . . .

**§26-57-261(a)(2)(B)(ii)** (emphasis added).

This differs from the Allocable Share Refund provision, which provided, in relevant part:

---

[4]"Units sold" is defined as "the number of individual cigarettes sold in the state by the applicable tobacco product manufacturer." A.C.A. §26-57-260.

To the extent that a tobacco manufacturer establishes
that the amount it was required to place into escrow in
a particular year **was greater than the State's allocable
share of the total payments that such manufacturer would
have been required to make in that year under the Master
Settlement Agreement** . . . had it been a participating
manufacturer, the excess shall be released from escrow
and revert back to such tobacco product manufacturer.

**A.C.A. §26-57-261(2)(B)(ii)**(emphasis added).

The distinction is illustrated by an explanation of how an NPM

could use the original allocable share refund (or "allocable share

release") provision to its advantage, found in **Freedom Holdings,**

**Inc. v. Spitzer**, 2004 WL 2035334 (S.D.N.Y. 2004):

> In practical effect, the Allocable Share Release
> provision provided NPMs with substantial competitive
> advantages from concentrating their efforts on regional
> distribution.  If an NPM distributed its cigarettes
> nationally, and its distribution patterns approximated
> those of the national market, its payment obligations on
> its national sales would be apportioned 100 percent among
> the settling states, with the result that something close
> to 100 percent of its payments would, in the aggregate,
> be retained under the Escrow Statute and not released
> under the Allocable Share Release provision.  However,
> if an NPM were to concentrate its business to the New
> York--New Jersey--Connecticut area, for instance, it
> could gain a competitive advantage in that region,
> because it would make 100% of its sales there and would
> be able to recoup the payments on all but roughly 16.5%
> of them, these being approximately the percentage shares
> of those states.  While the OPMs and SPMs would be
> required to continue 100% of their payments under the
> MSA, an NPM which focused on the New York metropolitan
> area could be exempt (aside from the time-value of its
> money between when it was escrowed and when it was
> released) to the extent of over 80% of its business.

When viewed in the context of the statutes at issue, it

becomes clear that what plaintiffs are really complaining about is

the loss of the competitive advantage that could be enjoyed under the Allocable Share Refund provision. The cases cited by plaintiffs in support of their First Amendment argument will not support a claim that the loss of a competitive advantage (as opposed to the imposition of a burden not borne by other tobacco companies) unconstitutionally burdens speech, regardless of whether it is commercial or political in nature. The Court, therefore, concludes that the Motion To Dismiss should be granted as to plaintiffs' free speech claims.

8. Defendant next contends that plaintiffs have failed to state a claim that their rights to equal protection have been violated, regardless of whether that claim is analyzed pursuant to the Equal Protection Clause of the 14th Amendment to the United States Constitution, or the equal protection provisions found in Article 2, §3 and §18 of the Arkansas Constitution.

State statutes are presumptively constitutional. **Lemon v. Kurtzman, 411 U.S. 192 (1973),** citing **San Antonio Independent School District v. Rodriguez, 411 U.S. 1 (1973).** Statutes dealing with economic issues must pass only a rational basis test to survive constitutional scrutiny. The rational basis test has been articulated by the United States Supreme Court as follows:

> Under rational-basis review, where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation. Such a classification cannot run afoul of the Equal Protection Clause if there

is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Moreover, the State need not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification.

**Board of Trustees of University of Alabama v. Garrett**, **531 U.S. 356, 367-68 (2001)** (internal citations and quotation marks omitted).

That same test has been articulated by the Arkansas Supreme Court as follows:

There is a presumption of constitutionality attendant to every legislative enactment, and all doubt concerning it must be resolved in favor of constitutionality. If it is possible for the courts to so construe an act that it will meet the test of constitutionality, they not only may, but should and will, do so. The party challenging a statute has the burden of proving it unconstitutional.

**Holland v. Willis**, **293 Ark. 518, 739 S.W.2d 529 (1987).**

The State of Arkansas clearly has the authority, under its police powers, to protect the health and welfare of its citizens. As evidenced by the Emergency Clause enacted with the Allocable Share Amendment, the State has found that tobacco use poses a threat to the health and welfare of those citizens, i.e., "smoking poses a serious health risk to Arkansans," and that the Allocable Share Amendment was necessary for the effective administration of the MSA, which "is a critical component in reducing the rate of smoking in Arkansas." **Act 384 of 2005, §5.** These provisions of the Emergency Clause reflect a rational relationship between the Amendment and its purpose.

-19-

Plaintiffs support their equal protection argument with their allegation that the escrow deposits required of Dos Santos under the Allocable Share Amendment will exceed the amount of money Arkansas would receive as its allocable share of an MSA payment made by Dos Santos if Dos Santos were a PM.  Even taking this allegation as true, it will not support plaintiffs' equal protection claims.  It is not what *Arkansas would receive* under the MSA, but what *Dos Santos would pay*, that is relevant.  And under the Allocable Share Amendment, Dos Santos cannot be required to pay more, for its Arkansas sales, than would a PM.  While one figure is computed on a direct per cigarette basis, and the other is computed as a percentage of market share, that is not dispositive.  As noted by the Supreme Court:

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.  If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality.  The problems of government are practical ones and may justify, if they do not require, rough accommodations - illogical, it may be, and unscientific.

**U.S.R.R. Retirement Board v. Fritz**, **449 U.S. 166, 175,** **(1980)** (internal citations and quotation marks omitted).

For the foregoing reasons, the Court concludes that plaintiffs' equal protection claims must be dismissed.

9.  Defendant next contends that plaintiffs have failed to state a claim for deprivation of property without due process of

law. Plaintiffs, for their part, respond that the Amendment violates not only procedural but also substantive due process. The Court will examine these claims first from the perspective of the Amendment as applied prospectively, and then as to its retroactive application, commencing with the issue of substantive due process.

10. Before addressing those specific issues, it is necessary to determine whether plaintiffs have been deprived of a protected interest in liberty or property. If so, then the substance and procedure attendant upon that deprivation are examined to see if they comport with due process. **American Manufacturers Mutual Insurance Co. v. Sullivan, 526 U.S. 40 (1999).**

Defendant, while not contesting that Dos Santos has a property interest in the funds that must be escrowed under the Allocable Share Amendment, suggests that Dos Santos has not been *deprived* of that property interest, because the money paid into escrow continues to belong to Dos Santos unless and until the State files suit and either prevails at trial or achieves a favorable settlement of its claim. This argument runs counter to established law. "[A] temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." **Fuentes v. Shevin, 407 U.S. 67, 84-85 (1972).** The Court, therefore, finds that Dos Santos has been deprived of an interest in property by the Allocable Share Amendment.

11.    In  order  to  pass  substantive  due  process  muster,
legislation need only have a rational relationship to a legitimate
state  objective.    The  Due  Process  Clause  "does  not  empower  the
judiciary  to  sit  as  a  superlegislature  to  weigh  the  wisdom  of
legislation."  **Exxon Corp. v. Governor of Maryland**, **437 U.S. 117,**
**124 (1978)** (internal quotation marks omitted).  As explained in ¶7,
*supra*,  the  Court  has  found  a  rational  relationship  between  the
Allocable  Share  Amendment  and  the  State's  expressed  purpose  of
ensuring effective administration of the MSA, which is a critical
component in reducing the rate of smoking in Arkansas.  Thus, as
to plaintiffs' claim that prospective application of the Allocable
Share  Amendment  violates  substantive  due  process,  the  Motion  To
Dismiss will be granted.

12.    Plaintiffs  contend  that  retroactive  application  of  the
Amendment is qualitatively different from prospective application.
They  point  out  that,  in  2004  -  prior  to  the  enactment  of  the
Allocable Share Amendment, which requires a higher per-cigarette
payment than did the Allocable Share Refund provision - they made
their  pricing  decisions  in  light  of  the  Allocable  Share  Refund
provision.  Thus, plaintiffs argue, the escrow deposits they have
already made are inadequate under the Allocable Share Amendment
and, in fact, the cost to meet the new escrow deposits required
under  the  Allocable  Share  Refund  provision  would  exceed  the
revenue generated by their sales during that period of time.

The Supreme Court has long recognized that legislation can legitimately "sweep away settled expectations suddenly and without individualized consideration," and for that reason, "retroactive statutes raise particular concerns." **Landgraf v. USI Film Products, 511 U.S. 244, 266 (1994).** In **Landgraf**, the Supreme Court listed, as being of particular concern, legislative enactments which infringe on constitutional prohibitions against *ex post facto* laws, laws which impair the obligation of contracts, laws which effect takings without just compensation, bills of attainder, and laws which deprive an affected person of due process.

> Absent a violation of one of those specific [constitutional] provisions, the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope. Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary.

**511 U.S. at 267-68.**

Defendant argues that the purpose of the Allocable Share Amendment is "benign," "legitimate," and "meant to 'correct mistakes' resulting from the language of the original legislation," and that since the Amendment's intent to apply to 2004 escrow deposits is clear, there is no constitutional impediment to such application. As the Supreme Court stated in

**Landgraf**, clear intent assures that the legislative body "has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." **511 U.S. at 272-73.**

In **Usery v. Turner Elkhorn Mining Co.**, **428 U.S. 1 (1976),** the Supreme Court took up a due process challenge to a federal statute which retroactively imposed on mining companies liability for injuries caused to miners by the conditions under which they worked, even in situations where the miners had terminated their employment before the statute was enacted. The Court there noted that

> legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. . . . [L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. . . . This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

**428 U.S. at 15-16.**

However, as explained in the later case of **Pension Benefit Guaranty Corp. v. R.A. Gray & Co.**, **467 U.S. 717, 733 (1984),**

> retroactive legislation does have to meet a burden not faced by legislation that has only future effects. It does not follow . . . that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former. But that burden is met simply by

showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

**467 U.S. at 730** (internal citations and quotation marks omitted).

Given that "retrospective civil legislation may offend due process if it is particularly harsh and oppressive," a standard which does not differ from "the prohibition against arbitrary and irrational legislation," **Pension Benefit**, **467 U.S. at 733**, the Court finds that plaintiffs have stated a claim that the retroactive application of the Allocable Share Amendment violates their constitutional right to substantive due process, and the Motion To Dismiss as to that claim will be denied.

13.   The Court next examines the procedure used to effect the deprivation of property worked by the Amendment.  The fundamentals of procedural due process are, of course, notice and an opportunity to be heard:

> For more than a century the central meaning of procedural due process has been clear:  Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.  It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.

**Hamdi v. Rumsfeld**, **542 U.S. 507, 533 (2004)** (citations and internal quotation marks omitted).

14.   Plaintiffs' procedural due process challenge, as to the prospective application of the Amendment, relates to the opportunity to be heard.  Does it occur at a meaningful time, and

in a meaningful manner?  Depending upon the circumstances, this right may be fulfilled either before or after a deprivation.  In **Mathews v. Eldridge, 424 U.S. 319 (1976),** the Supreme Court took up the issue of whether - and under what circumstances - a due process hearing must be held *before* government deprives an individual of property.  The Court there stated that

> identification of the specific dictates of due process generally requires consideration of three distinct factors:  First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

**424 U.S. at 334-35.**

The Court now examines these factors to determine whether it appears that plaintiffs could prove facts under which procedural due process would require a pre-deprivation hearing in connection with their escrow payments:

(a)  The affected private interest, in this case, is the sums of money Dos Santos has been, and will in the future be, required to deposit into escrow and leave there for 25 years.  These sums are alleged to be substantial, an allegation the Court accepts as true in connection with the Motion To Dismiss.  The weight of the private interest is offset by several factors, however.  The escrowed sums are no greater than the sums that OPMs

are required to pay each year for the privilege of selling cigarettes, and NPMs, unlike OPMs, are not giving up ownership of their money.  While the escrow deposits are not tax deductible, as are MSA payments, Dos Santos and the other NPMs are compensated for the loss of use of the escrowed funds by the interest that accrues on those funds, and the escrow payment obligation is not coupled with restrictions on speech to which the PMs are subjected. In view of these facts, the Court does not find that the private interest of the NPMs weighs very heavily in the **Mathews** analysis.

(b)  Although plaintiffs contend that the risk of an erroneous deprivation is substantial - they allege that the payments called for under the Amendment are not justified on the basis of any current showing of wrongful conduct on their part nor on the basis of "leveling the playing field" between NPMs and PMs - they do not dispute that their tobacco products, like any other tobacco products, have the potential to cause harm.  This undisputed fact reduces the risk of erroneous deprivation to a point where procedural safeguards - in addition to those attendant upon the litigation that would be necessary before the State could deprive an NPM of ownership of its escrowed funds - would be of little benefit.

(c)  The Amendment's Emergency Clause demonstrates the State's interest in this matter:  reduction of smoking, which

requires effective administration and enforcement of the MSA. A pre-termination hearing would entail significant burdens on this interest, as it would require premature litigation of potential claims the State might levy against plaintiffs, with the attendant risks of erroneous decision and the expenses and burdens - on both the State and the NPMs - of litigation.

Given the relatively small risk of an erroneous deprivation, the minimal value of additional procedural safeguards, and the State's unquestionable interest in the matter, the Court concludes that plaintiffs could prove no set of facts under which a pre-deprivation hearing would be constitutionally required in order for the State to implement the Allocable Share Amendment.

Although the Court concludes that a pre-deprivation hearing is not required, that finding does not completely answer the procedural due process question because, at some point, Dos Santos will be entitled to a hearing if it is to be deprived of ownership of its escrowed funds.

Defendant contends that the available post-deprivation remedy is constitutionally sufficient -- in that Dos Santos will either have the right to release of the escrowed funds (after 25 years) or will have the issue resolved through litigation, with all its attendant procedural protections.

Plaintiffs disagree and insist that defendant's argument misses the point of their post-deprivation procedural due process

contention: that the State can deprive an NPM of the use (although not the actual ownership) of its funds for up to 25 years without any hearing whatsoever.

It is axiomatic that for due process to exist, the right to be heard must come "at a meaningful time." **Fuentes v. Shevin**, **407 U.S. 67, 80 (1972).** The Court's research has not disclosed any case in which a 25-year delay between deprivation and remedy has been approved – or even considered.  However, the Supreme Court has offered some guidance as to how to evaluate the issue.

In **U.S. v. Eight Thousand Eight Hundred and Fifty Dollars**, **461 U.S. 555 (1983),** the Court took up the question of "when a post-seizure delay may become so prolonged that the dispossessed property owner has been deprived of a meaningful hearing at a meaningful time," and approved a framework for determining whether the delay in providing a post-deprivation remedy violated the due process right to be heard at a meaningful time.  The Court there said that the four factors to be considered were the same as those supplied in **Barker v. Wingo, Warden**, **407 U.S. 514 (1972),** to-wit:

* the length of delay;

* the reason for the delay;

* the property owner's assertion of his rights; and

* prejudice to the property owner.

In this case, as in **U.S. v. Eight Thousand Eight Hundred and Fifty Dollars**, "the overarching factor is the length of the

delay." There, the Court considered a delay of some 18 months to be "quite significant," but determined it to be reasonable on the facts of the case. Here, the delay of 25 years is obviously "quite significant." However, the reason given for the delay is also "quite significant" in the Court's view. Smoking-related health problems (and their costs) take years to appear and, thus, the State needs a "quite significant" amount of time to evaluate whether a given NPM is responsible for those costs before taking legal action. Plaintiffs do not suggest that the stated reason for the delay is false, nor do they persuasively argue that a lesser period of delay would serve the purpose equally well. Thus, the Court finds that the first two factors weigh in favor of the defendant's position.

The fourth factor, prejudice to the NPMs, also tilts in favor of the defendant. While the NPMs are deprived of the use of their escrowed funds pending the post-deprivation remedy, they are compensated for that loss by receiving interest on those funds. Meanwhile, they are able to conduct their business without restrictions on their speech. In the heavily-regulated tobacco industry, the resulting prejudice to the NPMs, on balance, is small.

The third factor, as made clear in **Barker**, is essentially a consideration of whether the property-owner acquiesces in any delay in obtaining a post-deprivation remedy. Given that

plaintiffs filed the instant litigation, that factor weighs in their favor. It does not, however, outweigh the other factors in the Court's view.

After careful consideration, the Court believes that application of the **Barker** balancing test yields the conclusion that in the particular circumstances here presented, the post-deprivation remedy (either return of the funds at the end of 25 years or litigation if the right to return is disputed) is constitutionally sufficient. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." **Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy**, 367 U.S. 886 (1961).

15. With regard to plaintiffs' allegation that retroactive application of the Amendment violates procedural due process, the Court finds that they have stated a claim based on lack of notice. "Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply," **Texaco, Inc. v. Short**, 454 U.S. 516, 532 (1982). In this case, however, plaintiffs did not have, and could not have had, notice of the existence of the Amendment in 2004, because it had not yet been enacted. The Court finds this allegation sufficient to state a claim for deprivation of procedural due process as to the retroactive application of the Amendment.

16. Finally, defendant argues that plaintiffs have failed to state a claim under the Commerce or Supremacy Clauses of the United States Constitution. Plaintiffs do not contend that they have stated any claim under the Supremacy Clause, and the Court will treat that claim as abandoned.

With regard to the Commerce Clause claim, the Supreme Court has explained that it has

> adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interest, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. We have also recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.

**Brown-Forman Distillers v. New York State Liquor Authority**, **476 U.S. 573, 578-79 (1986).**

The Allocable Share Amendment, as can be seen on its face, makes no distinction between interstate and intrastate commerce. It treats all NPMs in exactly the same fashion. To the extent that it has any impact whatsoever on interstate commerce, that impact is indirect. The State's interest in regulating tobacco manufacturers is a legitimate one under its police powers, with significant local

benefits, as expressed by the Emergency Clause. Nothing in plaintiffs' Complaint, or in their brief on the issue, indicates that they can prove up a set of facts under which any indirect impact on interstate commerce would exceed that State interest. The Court, therefore, finds that the Motion To Dismiss as to the Commerce Clause claim should be granted.

**IT IS THEREFORE ORDERED** that **Defendant's Motion To Dismiss** (document #3) is **granted in part and denied in part.**

The motion is **denied** insofar as it seeks dismissal of plaintiffs' claim that retroactive application of **A.C.A. §26-57-260-261**, as amended by **Act 384 of 2005**, to plaintiffs' escrow deposits for 2004 violates substantive and procedural due process.

The motion is **granted** in all other respects.

**IT IS SO ORDERED.**


  **/s/ Jimm Larry Hendren**
  **JIMM LARRY HENDREN**
  **UNITED STATES DISTRICT JUDGE**